Our second case this morning is the Molisana S.p.A. v. United States, 2023-2060. Mr. Craven, when you are ready. Good morning, Your Honors. May it please the Court, my name is David Craven. I'm with Craven Trade Law, and I'm here today on behalf of La Molisana S.p.A. and Valdi Grano di Flavio Pagani. And we're here to talk about, ultimately, accuracy during the course of an anti-dumping duty investigation. And all of the issues involved here ultimately relate to the question of model match. And model match ultimately drives many anti-dumping duty cases, because the key here is you want to compare Toyotas to Toyotas and Rolls Royces to Rolls Royces. And so it's very important in model match to avoid a comparison where you have a Rolls Royce and Toyota, both automobiles, being compared because they're very different on price levels. Now, the first thing I'd like to mention is the elephant in the room, and that's the Loughborough-Bright decision overturning Chevron deference. We're not going to talk about that in great detail today, unless you wish, because it is ultimately a relatively straightforward case. But in this case, as you would note from the filings of the government, almost all of their decisions say, we win because we have deference, and they're citing the Chevron deference and other deference that relates to Chevron deference. So we think that that alone might very well justify returning this to the CIT to have the CIT consider the actual issues in light of the fact that decision making has now been passed on in some ways So aren't they, like for the rounding up argument that you have, they're relying on commercially significant. And with respect to the U.S., the difference between the Italian and U.S. conversion, they are relying on transparency and and also maybe CIT added commercially significant. So I'm not sure we need to talk about deference because I don't think they're just saying, primarily they're not just saying, defer to us. Our rule has been around forever. It's great. Right? Well, I think I think in some ways they are doing that because they are saying here, we have already made these decisions. We know that they can't rely on that. That's right. OK, that's right. But let's talk about some of these things. The first thing is there's the Fagerstown case, Stainless, which says that accuracy is really the most important, not transparency. I'm sorry to jump in on you there. Sure. We're talking about a case. I don't want to break up your train of thought. But I have I do have one question. As I understand your brief, you don't challenge the use of labeling. What you're saying is there should be, for purposes of anti-dumping, there should be an adjustment done by Commerce. Correct. With respect to what's on there. You're not saying the labeling should be changed. You're saying that Commerce should go through this adjustment that you advocate in your brief. Well, I think that partially is because... Am I right in understanding your argument? Yes, you are. Because the labeling issue, using labeling, had been the fight of an earlier fight. And so we had conceded at the time that Commerce, through its discretion, had decided that labeling was the appropriate method for determining. So our response was, okay, if you're going to use labeling, you have to still engage properly in unit conversion. Because the labeling itself is inaccurate if you don't take into account the unit conversion. There's a significant difference, and it's commercially significant, between the US standard of 6.25, I believe it's pronounced Kegidal units, per gram of protein, versus the Italian standard of 5.7. Well, that's a question of fact, isn't it? Well, but I think no one disagrees that that isn't the fact. The government has agreed with you that these calculations, there are inconsistencies or inaccuracies brought in as a result of both rounding and the difference in conversion. But they say that they are not commercially significant. They say they're not commercially significant, yet their determination as to what is high quality and low quality, they're taking with a hundredth of a percent of protein. So in other words, your view is that the pasta, do I have this correct, that the protein is a proxy for the greater quality of the semolina wheat? Yes, that is. And they say that the semolina wheat is commercially significant, the amount of it, the quality, the grade of it, excuse me. But part of the problem, of course, is that you end up comparing identical product under different categories. So just to make sure I understand the context. Sure. Okay, so you do this market match so that you then can figure out what is the like foreign product to the product at issue? And I'm selling you a pound of spaghetti in the United States. The United States uses a 56-gram serving size. The rounding means that it's eight grams of protein per serving, which rounds to exactly 12.5 percent, which means it is standard, I'm sorry, it is a premium quality pasta. In Italy, they use a 100-gram serving size. So our same reporting is that a lower grade pasta in Italy, also using a different protein content, ends up being 11.5 percent protein. My question was more just my basic understanding. What is the purpose of method match? Model match. Model match, sorry. What is the purpose of model match in the anti-dumping duty scheme? I think what it's doing is it is telling you what the foreign like product is that corresponds to the U.S. product that you're looking at to determine whether dumping is a crime, right? Well, what it does is it enables you to, you have to categorize every product and match similar products to similar products. Not identical. I can see that you will have situations where you will have similar product that will be matched to similar product. And it categorizes each group into a different pool. And you compare each pool. So my standard grade spaghetti is compared to my standard grade spaghetti in both the home and U.S. markets. And my premium spaghetti is compared to my premium spaghetti in the home and U.S. markets. But when the model match doesn't work, you end up comparing premium spaghetti sold in the U.S. market, sorry, standard spaghetti sold as premium because of the model match compared to high priced spaghetti in Italy. It creates an artificial dumping margin because you're not comparing it to the exact same thing. And if a company makes two identical packages of pasta because of this model match methodology, one is going to be in standard and the other is going to be in special. Counsel, this methodology has been in place for, what, at least 12 years. You've got an expert agency taking a position to maintain it and an expert court affirming that. Why should we overturn all that just because it doesn't fit your client's needs? It's not just my client's needs, Your Honor. I think it's the basic concept of accuracy. And this has been a subject of fighting. There have been numerous different approaches taken to try to figure out how to do model match. And this is a relatively recent... We don't have any amicus briefs here. No, we do not. What is the standard you have to satisfy? It's a substantial evidence standard. That's right. So we have to see whether there's substantial evidence that there's not compelling reasons to revise the model match methodology, right? And you would say there is substantial evidence. Absolutely. Mr. Quinn, as I understand it, the nub of your argument is without doing the adjusting, I'll call it, that you present in your brief, the pasta is inaccurately bumped up into the higher standard. Yes. Premium. That's the nub of what you're saying. That's right. But the more critical part of this, I think the biggest point is you have identical product in the home market and the U.S. market. Literally, the only difference is the package. And you're going to tell me that they're classified differently because of the fact that the Commerce Department doesn't believe that you should do unit conversion. Can I ask you another question? Yes, ma'am. I want to really get to the reasons that are provided by the government for why it's okay to have these mismatches.  And one of the reasons, they say, is transparency. First of all, do you know where the transparency requirement comes from? Is that statutory, regulatory, or is it something that Commerce is striving to do? I believe it's something Commerce is striving to do. And furthermore, I think, again, accuracy has to trump transparency. But in any event, it is still relatively... Does accuracy come from the statute itself that uses the language... It comes from practice, I think, Your Honor. Or is it from the language identical in the statute? Well, I think it also comes up just from the practice. All right. Because that's always what you're striving for, is to have accurate calculations. This Court has held that accuracy is important. Okay. I interrupted you. You were going to address transparency. But I think the answer is it's still perfectly transparent. If I take a package and I... If I see a thermometer on the street corner and the thermometer says 35 degrees and it's really cold, it's really hot in Washington, D.C., then I know transparently that that thermometer is in centigrade, Celsius. The same way that when I look at a... Personally, I don't necessarily... People can do the conversion. People can do the conversion. And it's not hidden. It's a very... It's in the CFR. But what about the rounding up? That's a little different. I mean, it's not a big margin. But, as you said, these margins matter. Well, but the answer is the rounding up is for the convenience of the customer. But it also isn't... It is commercially significant for determining quality of the product. In terms of calculating your diet, the difference between 11% protein and 12.5% protein probably doesn't affect your diet. But what about... I was just... Again, I mean, I think you've got me at least on the point that there are differences. I'm trying to think about the transparency point. So think about the transparency point with respect to rounding up. Well, I didn't... I mean, maybe, you know... I think... Do I understand correctly that the producers are providing this data anyway? It's not like commerce is going to the store and grabbing all the boxes, right? Correct. I'm sorry. John, I'm in my rebuttal time, but I would be happy to continue if you wish. I think you probably should answer the question. Sure. I'm sorry. Please. Your question was that, no, commerce is not going to the store. We are reporting it. And before the change was made, we used to report the actual protein content. And, again, we're not asking for... I'm also not sure how transparency should affect the calculation of the dumping margin, because ultimately commerce's decision is not based on what the customer thinks. It's what's the actual product. What is the actual physical makeup of the product that they're examining and comparing apples to oranges? And you're saying that information is provided by the producers? Can be provided. In prior reviews, we used to provide... The producers are still providing what's on the box, even under the current system. Absolutely. Yes. Thank you. I'd like to save my last two minutes, please. We will do that. Thank you, Your Honor. Good morning, Ms. A. Good morning. May it please the Court, The trial court correctly sustained commerce's decision not to adjust its model-matching methodology as reasonable, and this Court should affirm. I'd like to just briefly start by addressing Chevron, as Mr. Craven did as well, and Loper Bright, of course. And I think for a few different reasons, Loper Bright doesn't fundamentally change anything about this case or the Court's analysis in this case. The critical standards of play, of course, here are commerce requires compelling reasons to switch from its model-matching methodology, and that commerce can treat slightly different products as identical, so long as those differences are not commercially significant. Neither of those standards... Go ahead. I don't want to interrupt your sentence. Finish. Oh, no. I was just going to say, neither of those standards should be called into question by the Supreme Court's decision in Loper Bright. I'm happy to answer any further questions on Chevron and Loper Bright. Otherwise, I can move directly to the substance of commerce's decision. Do you agree that commerce selected the protein percentage to determine light goods because protein percentage is a proxy for the quality level of the semolina wheat in the pasta? Yes. Commerce did select protein content as a proxy for semolina, I think, about 15 years ago, and it explained its reasons for switching from trying to directly value semolina to valuing protein. And then the reason for using nutrition labeling instead of using companies' internal data regarding protein. But certainly, protein content as a proxy for semolina is one of the physical characteristics that commerce used to determine the quantum to compare foreign-like products. So you agree that the grade of semolina... Commerce said the grade of semolina is commercially significant? It's that same document from 2009, and they specifically say the grade of semolina is commercially significant, and they also say that protein approximates the grade of semolina. I'm trying to... I'll give you a page... Sure, yes. I do have in my notes here about that one, but I don't have the semolina being commercially significant. All right, A2610. Ms. Bailey, that's handy having that tablet there. It is, except... That's a big speck of it. It can be a little bit harder to scroll, unfortunately. I apologize for that. While I scroll through this... It is around middle of the page, and if you'd like, I can read it to you. Thank you, Your Honor. I apologize. It's all right. It says, We found that these quality differences reflected in semolina costs and pasta prices. We found that they are commercially significant and an appropriate criterion for product matching. I mean, I guess I would say, you know, without access to the full context right now, that certainly that differences in semolina quality can be commercially significant, but I don't think that that means that Commerce's decision to say that when we are reporting protein content based on the nutrition package label and any slight differences that might occur from the differences in the FDA rounding standards and the nitrogen content multiplier aren't commercially significant. And again, Commerce explained why those differences aren't commercially significant, and now that Commerce is using the nutrition label, and, you know, Mr. Craven even said that he's not contesting Commerce's decision to rely on that nutrition label, then it's still important that Commerce made that determination, and the trial court sustained that there was nothing on the record demonstrating that any such differences caused by FDA rounding or nitrogen content multipliers are commercially significant. What was Commerce? You said Commerce explained why those differences aren't commercially significant. Yes. What was Commerce's explanation? I think it was that customers look at the box and see the protein percentage. Yes, they're not commercially significant because, as Commerce said, yes, customers of pasta and not just the ultimate customer, but intermediaries of customers and sellers and buyers at various points along the way are going to rely on the protein content of the finished package. There's no evidence there of that, and also what case law is there that you have that says that that's how you determine whether something's commercially significant is by looking at what customers are looking at on the box, for example. I don't think that, you know, Commerce cited a specific case law other than Pesquero Mares, which just has the general standard of commercial significance, but I think that Commerce's reasoning for the fact that customers are going to rely on the protein content published on the package rather than this internal information is because, you know, customers of this pasta wouldn't probably even know this information about FDA rounding or nitrogen content multipliers. This is not common knowledge to anyone. What about the fact that the grade of the semolina is said to, like, provide different greater qualities of the pasta, which then puts it in the premium bucket, and there's a line that's being drawn at 12.5. Yes. Right? And it's whether it's premium or whether it's not as good. There's, like, multiple different qualities to this higher-grade semolina pasta, and that are described in this very same document. And so when sometimes a product, because of the difference because of rounding, is then characterized as being premium instead of what it would be characterized as standard in Italy, why isn't that commercially significant? Because when Commerce itself chose the dividing line and said that the quality of the semolina matters. Well, I think, for one, it's commercially significant because, as the trial court said, there's simply no evidence, no actual evidence in the record that appellants have pointed to to conclude that these differences in nitrogen multiplier and rounding rules would end up mattering in the workplace because it's not what sellers and buyers. In the workplace? I said workplace. I meant marketplace. I apologize. But Commerce themselves have said it matters. I don't think. In this document, Commerce chose the dividing line and said that this, we're relying on these four different commodities exchanges to pick this dividing line. And this is the difference, how everyone measures the difference between quality pasta, I mean, sorry, they're all quality, I guess, but standard pasta and premium pasta. So how can we say it's not commercially significant to have mathematical inaccuracies in determining whether one falls in this bucket or that bucket? Again, because, as Commerce said, the determination, its determination of commercial significance is whether this is going to matter to customers in the marketplace. And where's the case law to support that? I don't think that there was any specific case law that was pointed to, although the Pescar, except for Pescar Amares, but I believe. Can you answer one other question, which is, do I remember correctly that when we're talking about saying, hey, it doesn't matter if there's physical differences. We can just say it's commercially insignificant. Before we get to that, it's only under the case law that it has to be minor physical differences, right? I do believe that under Pescar Amares it is minor physical differences. So there's a presumption that these differences are minor. No, I think what Pescar Amares says is that. No, no, in this case, in order to get to, just to make sure I understand, if we're going to hinge and say commerce's methodology is okay because it's not commercially significant, we have to also determine that there are differences that are created by this mathematical, this erroneous math, is that those differences are minor. Well, I think the, I think the decision of whether to construe those differences as minor is tied to being commercially significant. I read Pescar Amares to basically say that, you know, if the differences are not found to be commercially significant, then they'd be sufficiently minor to be able to be construed as.  I read it as saying, I'm quoting, despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant, then products can still be considered identical. Do you agree with that statement of the law? Yes, I do see that in Pescar Amares that it says, despite the existence of minor differences, if these minor differences are not commercially significant. But I would also say in Pescar Amares that, I think that one thing that supports commerce's decision as far as the specifics in Pescar Amares is that in that case, commerce found that the difference in, I think, between super premium grade salmon and premium grade salmon was not commercially significant because it's not a commercially recognized separate grade of salmon in the marketplace. And so I think that in that. Do you have that? That it's not, is it commercially recognized? Distinguishing, you're relying on commerce, you're relying on data from four commodities exchanges in Italy that distinguish between the quality of the pasta based on 12.5% protein. Yes, but we're not only talking about the 12.5% protein, we're talking about whether those small differences that are caused by the FDA rounding standards and the nitrogen content multiplier, it's whether those differences are commercially significant. And I would say that like in Pescar Amares, there's no evidence that there's a commercial recognition of any of those differences between the FDA rounding standards and the nitrogen content multipliers. And because there's no evidence and no explanation of how those such differences are recognized by consumers in the marketplace, then I would say that commerce did make a reasoned decision that appellants did not present any evidence that it was commercially significant. So I understand. Your position is you accept, I guess, the calculations that are set forth in the appellant's brief here at page 17, showing how this calculation moves the pasta into the premium level, correct? But you're saying that doesn't matter because the consumer isn't aware of it. Well, I'm saying that I think we accept it with a caveat, which is to say we accept that there are FDA rounding standards that if somebody has an internal grade of protein content of 6.51, then it would be coded as a 7 versus 6.49 being coded as a 6. And we also accept that there's a difference in the nitrogen content multiplier between the U.S. and Italy. I think what we don't necessarily accept, and I think what's not supported by the record, is that this actually does affect the pasta in any real way. Appellants have spent a lot of time putting together charts saying, if this happens, if there's a pasta that's truly 6.51, then the FDA will require it to be made a 7, and then because of that it will be graded as a 13.5 versus a 12.5. But again, as with commercial significance, there's no actual evidence on the record that this happens. And given that Lama Lozano hasn't actually presented evidence that this happens, I think commerce is certainly reasonable in finding that that's not a compelling reason to modify its model match methodology, especially in light of the fact that commerce also thinks it's not commercially significant and also has a good reason for having switched away from using companies' internal data. Are there other areas where Congress has to rely on companies' internal data in doing its model match? I'm not sure off the top of my head. I mean, I know obviously commerce has to rely on, you know, books and records when doing accounting and certain numbers and determining anti-dumping and countervailing duty margins. But I think what's important here is not just that commerce generally doesn't want to rely on a respondent's books and records. I don't think that's something that commerce has said as a general matter. What about, in this case, we all can agree commerce isn't going out and grabbing boxes and looking at data. That data is being provided. Yes. And commerce is trusting that the nutrition label data is being provided accurately by the respondents. But I think it's important that in the 2009 administrative review where it switched from using company-specific information to nutrition label information, that commerce found that specifically with regard to that issue, it found that using company-specific information resulted in reporting inconsistencies between respondents and inaccuracies in determining the foreign-like products. Sure, but that's not it for us today, right? I mean, but can I ask you, where does the transparency requirement cited by the government come from? Is that statutory, regulatory, or practice? It's definitely practice. That's been mentioned by commerce for, I think, over a decade in this particular realm of model-matching methodology. And I do think it was sanctioned by the tribe. Is it in statute or is it in regulations? I'm not aware of it being in regulations. And I know commerce has referenced that they have a statutory responsibility for transparency and consistency. I just couldn't find anything. I can't find a single statute that supports that. So that's why I'm asking. And I really appreciate you answering. I have a lot of questions today. I appreciate all your answers. No, I completely understand. And I admittedly looked as well, and I don't think there's a specific statutory requirement that for model-matching, again, specifically, that commerce tries to ensure transparency and consistency. I do think that the SAA does have language sort of generally talking about commerce's responsibilities in terms of ensuring transparency and consistency, but I haven't found any specific language relating to, you know, the statutory requirements for model-matching or determining a foreign-like product. But I do want to point out that, you know, at least the trial court has found, so there is at least some case law supporting commerce's practice in this area, that commerce, you know, can make that a priority to favor transparency and consistency. So long as it doesn't conflict with some other more binding, some other higher level of law like a statute, right? Sure, but I do think that, I mean, yes, as long as there's no express conflict, but to the extent that commerce has to weigh transparency and consistency against, you know, other factors, then that, I do think, is where commerce does have a lot of discretion to do so. And I don't think anything... Can I ask you another question? You're going to run out of time. Oh, yes. So for transparency, for the conversion, why can't that still be transparent? Because the math can be determined. I mean, you know... Well, so one thing that puzzled me is that Lama Lasana says that it's not asking to use the company's internal data. It's simply asking for some sort of mathematical adjustment to account for these, like, FDA rounding standards and the multiplier. But I don't believe that Lama Lasana has actually suggested a way in which to commerce in which that could be done. Let's set aside rounding for a minute and just the difference in conversion and how we go from nitrogen units to protein percentage. There's a different calculation or weight used. I think one used 0.56 and one uses 0.65 or something like that.  Okay? Now, we both know that somebody smart can come up with an algorithm for conversion there, right? I'm sure somebody could do that at commerce. I mean, it's like going from Fahrenheit to Celsius. So that could be done. Do you agree? Yes, I don't think that commerce ever disputed that that could be done. But I think it decided that there wasn't a compelling reason to do it. I get it. And then, now, rounding up might be a little different. I think that was actually the last point I was going to make, which is that I don't see how you could adjust for the FDA rounding standards without going to that company's specific information that commerce is trying to avoid. They have to provide it anyway. They have to provide what's on the box. You could say, oh, it's 6.517. Well, the problem is what's on the box is the rounded amount, and that's what commerce wants to rely on because it's consistent across all respondents and across all PASTAs. And commerce doesn't want to rely on it. In 2009, commerce made the decision that it didn't want to rely on company-specific data because there were – That was just when they were coming in with company-specific information on the quality or grade of the wheat they were using, right? Not just – Let's be honest. I mean, determining the protein percentage and whether you take something and you say instead of it being 7, it's going to be 7.1 or 7.49 or 6.51, that that data is just going to be provided. I think the problem is that commerce found – It explained this in the – But commerce isn't going and looking at everyone's box, so they're relying on companies to provide what's on their box anyway. Sure, and I think there's a difference between relying on companies to provide what's on that box, which is publicly available, industry-wide, and is just out there for public consumption, versus company internal data where commerce has reason to think that there's inaccuracies in how companies report that protein content. And then it made that – It had that discussion in AR22 in the Jujuzara case that was before the trial court but not before here, that in that case, the respondents actually suggested not just for semolina but for protein content, that commerce could rely on the company's internal data. And commerce explained why there were inaccuracies and inconsistencies in reporting for that, too, so not just in the 2009 decision where they were switching model-matching methodologies. Thank you, Counsel. Thank you. Thank you, Your Honors. I just have a couple of points I'd like to raise. The first is the Boscoia-Moraes case. It doesn't stand for the proposition that I think they're saying – well, they're standing for the proposition that identical merchandise can be treated dissimilarly is not what Boscoia-Moraes stands for. It stands for the proposition that similar merchandise can be treated as identical. We don't disagree with that proposition. That's not what we have here. Here we have the case of identical merchandise potentially being treated dissimilarly, which is a completely different issue. Mr. Crane, what is your response to Ms. Bay's argument that commerce reasonably has a disinclination to rely on the company's specific information? Well, they verify. And if you provide information which turns out to be inaccurate, you fail verification and you get hit with adverse facts available. How do you verify? How do you verify? How do they verify? They send a team over to Italy and they go through the records of the company and they spend a week going through lab tests, whatever they want to go through. It's an incredibly complex – it's essentially a tax audit for a week of two or three Commerce Department employees going through the records of a company. And they do that even with the rounding? They can choose to verify whatever they choose to verify. They might not choose to verify protein content. And remember, protein content is not what the customer in the U.S. is looking for to decide if a product is a special pasta or a standard pasta. They're ultimately looking at the entire package. It's just that for purposes of Commerce's analysis, they decided to use 12.5 as a shorthand for the breakpoint between special and standard. That doesn't mean that the customer is going to use 12.5 as the breakpoint. Customers say, this is special, this is standard, which is why using the company's specific adjustments to the 8 would work. Because ultimately, yes, the transparency is there from what's on the package label, but ultimately that's not really why it's standard or special. And again, we go back to, is it commercially significant? I think there was a lot of discussion, I think Your Honor had in her colloquy, of how the difference between the different grades of wheat is significant. And I see my time is up, and I thank Your Honors very much, and I submit this matter to the Court. Thank you to both counsel. The case is submitted. That concludes today's argument.